| | | |
|---|---|---|
| TANGULA M. BETTS | ) | |
| | ) | |
| Plaintiff, | ) | No. 09 C 7094 |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner of | ) | Magistrate Judge Jeffrey Cole |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

This case involves a review of the final decision of the Commissioner ("Commissioner") of the Social Security Administration ("Agency") denying Ms. Betts' application for Social Security Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act ("Act"), 42 U.S.C. §§423(d)(2)(i) and 1382c(a)(3)(A). Ms. Betts seeks a reversal or remand of the Commissioner's decision. For the following reasons, the plaintiff's motion is granted.

**I.**

**INTRODUCTION**

The system of judicial review carefully crafted by the Congress necessarily reposes substantial discretion in the administrative law judge to make the threshold determination of witness credibility and issues of fact and application of law to fact. *Cf. Sarchet v. Chater*, 78 F.3d 305, 308-309 (7th Cir.1996). In reviewing the opinions of an administrative law judge in granting or denying social security benefits, the question is always whether the decision of the ALJ is supported by substantial evidence. If it is, the findings of the ALJ are "conclusive," and the decision must be affirmed. 42 U.S.C. § 405(g). Substantial evidence is such relevant

evidence as a reasonable mind might accept to support a conclusion. A court may not reweigh the evidence or substitute its judgment for that of the Social Security Administration. Resolution of conflicts in evidence is for the Commissioner. *White v. Barnhart,* 415 F.3d 654 (7th Cir. 2006). In order for the court to affirm an ALJ's denial of benefits, the ALJ must have articulated the reasons for his decision and clearly expressed the reasoning process that led from the evidence to the ultimate conclusion. *Cf.* 42 U.S.C. § 405(b); 20 C.F.R. 404.1527(d)(2), 416.927(d)(2).

In the instant case, the ALJ failed to build the necessary "logical bridge" from the medical evidence to his ultimate finding that the plaintiff was not disabled. *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009). The ALJ misstated the plaintiff's testimony when determining that she was not credible, impermissibly held her attempts to work against her, failed to follow Agency requirements when he disregarded the treating physician's medical opinion, and failed to resolve possible conflicts between the plaintiff's physical limitations beyond her exertional level and the occupations the vocational expert provided. The ALJ failed to give articulable reasoning to support his finding that Ms. Betts was not disabled. The ALJ made several illogical and erroneous statements, which demonstrates the invalidity of his reasoning. *See, e.g., Sarchet*, 78 F.3d at 306. The ALJ's decision is inadequate to assess the overall validity of his findings and the logical connection between the evidence and his conclusion. Thus, the case must be remanded to the Commissioner.

# II.

## PROCEDURAL HISTORY

Plaintiff filed applications for DIB and SSI on April 26, 2006, with an alleged onset date of February 6, 2003. (Administrative Record ("R.") at 99). In her application, the plaintiff claimed that she had been disabled since February 6, 2003, when she fell down some stairs and fractured her tailbone. (R. at 50). The plaintiff's medical record with regard to her alleged onset date begins on January 7, 2004, when she received an epidural injection to treat a herniated disc at L4-5. (R. at 295). The Social Security Administration ("SSA") denied the plaintiff's claim on June 15, 2006, and upon reconsideration on July 25, 2006. (R. 99-107, 110-14). Plaintiff filed a timely request for an administrative hearing. (R. 119).

On January 24, 2008, an administrative law judge ("ALJ") conducted a hearing at which plaintiff, represented by counsel, appeared and testified. (R. 43-97). James Breen testified as a vocational expert ("VE") at this hearing. (R. 80-97). In a decision dated May 6, 2008, the ALJ found the plaintiff was not disabled because she retained the ability to perform sedentary work with the option to sit or stand alternatively at will as long as the plaintiff was not taken off task for more than ten percent of a daily work period. (R. 34-36).[1] This became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review of the decision on April 27, 2009. (R. 7-9). *See* 20 C.F.R. §§404.981; 416.1455; 416.1481. Plaintiff has appealed that decision to the federal district court under 42 U.S.C. § 405(g).

---

[1] 20 C.F.R. § 404.1567(a) defines the physical exertion requirements for sedentary work: normally sitting, but sometimes requiring walking and standing, lifting no more than 10 pounds at a time, and occasionally lifting or carrying articles like docket files, ledgers, and small tools.

## III.

## EVIDENCE ADDUCED AT THE HEARING

The plaintiff was born on September 21, 1969. (R. 48). She was 34 years old at her alleged onset date (R. 218), and she was 39 years old at the time of the ALJ's decision. She is 5' 2" tall and weighs 205 pounds. (R. 48). She has a twelfth-grade education. (R. 48). Plaintiff has a commercial driver's license that she obtained in order to drive a school bus. (R. at 48-49). Plaintiff's most recent employment was as a bus driver, which she did part-time from September 2005 to February 2006 and from November 2007 to February 2008. (R. 15, 179). Plaintiff worked full-time, although intermittently, as a housekeeper from 2000 to 2003. (R. 224). Plaintiff worked full- time in an assembly line in 1999 (R. 224), and worked full-time as a file clerk from 1997 to 1998. (R. 224).

## A.

## The Medical Evidence

The relevant medical evidence dates from January 7, 2004, when plaintiff received an epidural injection for back pain (R. 295, 297).[2] On February 16, 2004, Plaintiff reported that her back felt better after the injection, but she felt pain in her left leg when standing after she stopped taking Celebrex, an arthritis medication. (R. 297). The treating physician, Dr. Payne, believed the plaintiff's symptoms were probably the result of flattening arches in her feet and the abnormal posture of her left foot. *Id.* The plaintiff saw Dr. Rieger on March 18, 2004. (R. 291). The plaintiff reported discomfort and swelling in both ankles, both of which increased when performing weight-bearing activities. (R. 291). Dr. Rieger increased the plaintiff's dosage of

---

[2] Although the plaintiff apparently received the epidural injection in January 2004, the first indication of such treatment is noted on February 16, 2004, over a month later, at a doctor's appointment for an unrelated condition. (R. 295). Medical records from the University of Illinois at Chicago could not be obtained due to an apparent fire at the medical records department. (R. 275). There are, however, some medical records from the University of Illinois at Chicago Medical Center within the administrative record.

Celebrex to 200 mg. and also gave the plaintiff shoe insoles to support the arches in her feet in order to control her pronation. (R. 291).[3]

On October 8, 2005, the plaintiff went to the doctor, complaining of pain in her upper back, on the left side of her neck and in her left shoulder. (R. 286).[4] On November 30, 2005, the plaintiff went to the doctor again, complaining of migraine headaches as well as tingling and radiating pain in her left foot, leg, and wrist. (R. 288).[5] When plaintiff went to a follow-up on December 8, 2005, she said the medication that she had been taking for headaches, naproxen, helped "a lot." (R. 283). At the December 8 appointment, the plaintiff was referred for an MRI to rule out the possibility that she had multiple sclerosis. (R. 283). Before the plaintiff had the MRI, she returned to the doctor on December 23, 2005, complaining of pain in her left buttock, left leg, and occasional numbness in her toes. (R. 281). The treating physician prescribed physical therapy, but wanted to wait to prescribe any medication until the plaintiff had the MRI. (R. 281). The plaintiff underwent an MRI on December 27, 2005. (R. 306). The MRI showed that there was a narrowing of the neural foramina in the C4-5 and C5-6 vertebra that was "most likely secondary to hypertrophic spur formation." (R. 306).[6]

An MRI of the plaintiff's lumbar spine that was taken on February 16, 2006 showed a large disc herniation between the L5-S1 vertebrae. (R. 360). On February 20, 2006, the plaintiff

---

[3] Pronation of the foot is what occurs when a person turns the sole of the foot outward, thus using the inside edge of the foot to bear one's weight. http://dictionary.reference.com/browse/pronate (accessed Nov. 4, 2010).

[4] Although the record is clear that the plaintiff went to see a physician for these symptoms, the treatment plan the doctor prescribed is illegible. As the plaintiff indicates in her Memorandum, a physical examination appears to show that she was in good health. *Plaintiff's Memorandum*, at 3.

[5] The record indicates that the plaintiff missed an appointment with a back specialist nearly three weeks prior to this visit to the doctor. (R. 288).

[6] Neural foraminal narrowing occurs when bulging or degenerating discs cause the nerve opening in the spine (known as the "foramen") to become narrower. This compresses the nerves within the spine and can cause "pain, numbness, tingling, and muscle weakness." *See* http://www.spinaldisorders.com/neural-foraminal-narrowing.htm (accessed Nov. 1, 2010).

was admitted to the emergency room at South Suburban Hospital due to severe pain radiating down her left leg. (R. 360). The treating physician, Dr. Chang, opined that the plaintiff was suffering from acute left S1 radiculopathy and a herniated L5-S1 disc. (R. 360). Dr. Chang recommended that the plaintiff undergo laminectomy and discectomy surgery. (R. 360).[7] On February 21, 2006, Dr. Chang performed the discectomy and laminectomy procedures. (R. 348-51). During surgery, Dr. Chang found ruptured disc fragments, which were removed, and a paraganglioma tumor within the plaintiff's S1 nerve root that was later determined to be benign (non-cancerous).[8] (R.349). After the initial surgery, the plaintiff was transferred to the University of Illinois Medical center for further evaluation. (R. 349). On February 22, 2006, Dr. Mahin Ziai did a follow-up test on the cells contained in the biopsy of the plaintiff's tumor. (R. 357-59). Dr. Ziai found mature ganglion cells, which led to a diagnosis of sympathetic ganglion versus ganglioneuroma.[9] The same day, an MRI of the plaintiff's back showed that the L5-S1 disc was still bulging. (R. 335).

Also on February 22, 2006, Dr. Engelhard, a physician at the University of Illinois at Chicago Medical Center, operated on the plaintiff to explore the tumor as well as perform a

---

[7] A laminectomy is a procedure that removes part of a vertebra in order to give a nerve root more space within the spinal column. It is typical used as treatment for lumbar spinal stenosis. *See* http://www.spine-health.com/treatment/back-surgery/lumbar-laminectomy-open-decompression (accessed Nov. 4, 2010). Stenosis is the narrowing of one area of the spine. *See* http://www.mayoclinic.com/health/spinal-stenosis/DS00515 (accessed Nov. 4, 2010). A discectomy is the removal of all or part of a herniated vertebral disc to relieve pressure on the nerve root. http://www.spine-health.com/glossary/d/discectomy (accessed Nov. 1, 2010)

[8] Paraganglioma is a type of tumor, normally benign, that originates from embryonic nervous tissue. <u>See</u> http://www.cancer.gov/dictionary/?CdrID=390305 (accessed Nov. 1, 2010).

[9] Ganglion is a cystic tumor. <u>See</u> http://medical-dictionary.thefreedictionary.com/sympathetic+ganglion/. Sympathetic ganglion is a chainlike collection of ganglion cells that is situated on either side of the spinal cord. *Id.* Ganglioneuroma is a tumor of the peripheral nervous system. *See* University of Maryland Medical Center, http://www.umm.edu/ency/article/001437.htm (accessed Nov. 1, 2010).

foraminotomy and a discectomy.[10]  (R. 327). Dr. Engelhard decided against attempting to remove the tumor because removal would have risked creating a "significant neurologic deficit, probably the total anesthesia in the region of the L5 with inability to dorsiflex the foot." (R. 327).  Based on the plaintiff's wishes, Dr. Engelhard instead completely decompressed the area of the spine where the tumor was located and recommended "serial neurologic examinations and MRI scans." (R. 327). At a follow-up exam that took place on March 9, 2010, the plaintiff stated that the surgery improved the pain and numbness she had been experiencing, and Dr. Engelhard gave the plaintiff a prescription to start physical therapy.  (R. 319).  The plaintiff discontinued physical therapy on April 6, 2006, after two weeks of appointments.  (R. 402).  Plaintiff told Dr. Engelhard that physical therapy "was not helping," and that it may have been aggravating her back, so he recommended she stop going. (R. 402).

On April 13, 2006, the plaintiff returned to Dr. Chang, complaining of severe pain radiating down her left leg.  (R. 344).  Plaintiff had returned to work earlier that week, and thought she may have aggravated her back at work. (R. 344).  Dr. Chang believed that the pain was most likely due to nerve irritation, and suggested using of steroids for a six-day period.  (R. 344). At a follow-up appointment on April 18, 2006, the plaintiff reported that her back was feeling much better.  (R. 343).  Dr. Chang prescribed Lyrica. (R.343).[11] On April 25, 2006, Dr. Engelhard sent a letter to the Director of Safety at the plaintiff's employer, stating that the plaintiff developed difficulties in her left leg after driving a school bus for less than ten minutes. (R. 316).  Dr. Engelhard also stated in this letter that, although he did not know if he was qualified to determine whether the plaintiff could continue to drive a bus, "it is certainly possible

---

[10] A foraminotomy is the procedure used to enlarge the opening the spinal nerve passes through vertebrae. *See* http://www.cure-back-pain.org/foraminotomy.html (accessed Nov. 4, 2010).

[11] Lyrica is a medication used for treating people with nerve damage. *See* http://www.drugs.com/lyrica.html (accessed Nov. 1, 2010).

that school busing would no longer be a job for her" because the plaintiff "certainly may have either a temporary or possibly permanent condition involving pain shooting down her left leg." (R. 316).

On May 16, 2006, the plaintiff returned to Dr. Chang's office, where she complained of continuing migration down her left leg. (R. 342, 386, 458). At this appointment, Dr. Chang opined that the plan for the plaintiff would be to pursue medical disability because he did not believe that she could continue to drive a school bus. (R. 342). The record indicates that, at some point between early April and mid-May, 2006, the plaintiff returned to physical therapy. (R. 342). On May 29, 2006, the plaintiff was admitted to the emergency room at South Suburban Hospital with complaints of a knot in her neck that had persisted for three weeks prior to the emergency room visit. (R. 456-57). The emergency room doctor, Sharon Smith, noted that a physical examination indicated that plaintiff's right submental artery was larger than the left, but all other tests came back normal, and the plaintiff was advised to follow-up with her primary physician.[12] (R. 456-57).

On August 15, 2006, Plaintiff returned to Dr. Chang for a follow-up appointment. (R. 455). Plaintiff complained of continuing numbness in her right leg. (R. 455). Dr. Chang found weakness in the right ankle and decreased sensation along the lateral right foot. (R. 455). Dr. Chang requested that the plaintiff follow up with Dr. Engelhard to determine whether the nerve tumor in her back had grown or otherwise changed. (R. 455). The plaintiff had an MRI of her cervical and lumbar spine areas on August 18, 2006. (R. 403-06). The MRI showed degeneration of the L4-5 and L5-S1 intervetebral discs. (R. 403). At the L5-S1 site, the MRI showed an "extruded herniated disc, which causes a high-grade neural foraminal stenosis and

---

[12] The submental artery runs along either side of one's neck. *See* http://medical.yourdictionary.com/ submental-artery (accessed Nov. 1, 2010).

left lateral recess stenosis with apparent impingement of the left L5 and probably the left sacral nerve roots" and some degenerative facet arthrosis. (R. 403). At the L4-L5 site, the MRI showed disc degeneration and mild degenerative facet arthrosis. (R. 403). The MRI of the cervical spine showed "very mild" spondylosis with slight left neural foraminal narrowing at multiple levels. (R. 406).

On August 31, 2006, Dr. Chang again suggested that the plaintiff should return to Dr. Engelhard for further treatment. (R. 454). On September 7, 2006, the plaintiff met with Dr. Engelhard to discuss treatment options. (R. 451-52). Dr. Englehard discussed three things with the plaintiff with regard to her on-going pain. If the nerve tumor had grown over time, it would probably need to be removed, which could have led to worse pain over time; they could try to use a different prescription medication for plaintiff's pain because the Lyrica the plaintiff had been taking did not seem to be helping; another possible way to block the pain would be to undergo a procedure to implant a dorsal column stimulator. (R. 451-52). The plaintiff indicated that she wanted to explore the third possibility, and Dr. Engelhard recommended that either Dr. Chang or Dr. Konstantin Slavin perform the procedure. (R. 452-53). On September 18, 2006, the plaintiff had saw Dr. Slavin who concluded that, based on the patient's "chronic radiculopathy that persists after 2 different operations," she was a good candidate for a spinal cord stimulation procedure. (R. 415-17).

On November 24, 2006, Plaintiff returned to the emergency room, complaining of left lumbar back pain that ranged from seven to eight on a scale of ten. (R. 418-20). Plaintiff stated that she had been feeling this pain for two weeks. (R. 418). The neurosurgeon who treated the patient recommended the plaintiff undergo an MRI and basic laboratory tests, but the plaintiff

did not wait for any tests and left the emergency room after being warned of possible neurologic injury and paralysis. (R. 419).

On February 12, 2007, the plaintiff had a follow-up appointment with Dr. Slavin, (R. 413-14), who opined that although the plaintiff's pain was under reasonable control, she still felt pain almost every day and took Aleve for pain relief. (R. 413). Upon reviewing the plaintiff's most recent MRI,[13] Dr. Slavin found that most of the postoperative changes had been resolved and that, besides the degeneration of the L4-L5 and L5-S1 discs, the tissues were well decompressed and that the scar at the surgical site was not interfering with any nerve roots or causing foraminal stenosis. (R. 413-14). Dr. Slavin did opine, however, that the postoperative changes were overall more prominent than they had been in the past. (R. 414). Dr. Slavin stated that the plaintiff would be a good candidate for the spinal stimulation procedure, but that she needed to complete psychological tests and tests to ensure her liver was not inflamed, of which her family doctor had recently warned her. (R. 414). Dr. Slavin wanted to be informed about a follow-up appointment the plaintiff was going to have with her family doctor to determine if she would be cleared for surgery. (R. 414). On March 6, 2007, the plaintiff notified Dr. Chang that testing showed her liver enzymes were still elevated. (R. 445). Plaintiff's primary physician would not clear her for surgery until her liver function improved. (R. 445). During an April 24, 2007 follow-up visit with Dr. Chang, the plaintiff reported that physical therapy had helped her back, that she was experiencing less pain in her left leg, and that she had returned to work. (R. 444). There is no indication at this point whether the plaintiff's liver had returned to a normal level of function. On June 13, 2007, the plaintiff contacted Dr. Slavin's office to schedule the spinal cord stimulator surgery. (R. 411-12). The plaintiff had not completed the mandatory psychological tests, however, and later cancelled a June 27, 2007 psychological testing

[13] There is no date associated with the MRI that Dr. Slavin notes in this report.

appointment. (R. 411). The plaintiff told Dr. Slavin's staff that she was not ready to proceed with the surgery because "she was having second thoughts" about the procedure and that her uncle was in the hospital so she had other things on her mind. (R. 411).

On July 6, 2007, the plaintiff returned to Dr. Chang's office, complaining of increased pain in her lower right leg.(R. 442).[14] Dr. Chang opined that he did not believe the pain in the plaintiff's right leg was related to the nerve tumor in her back because the tumor was "intrinsically wrapped" around the left L5 and S1 nerves. (R.442). On July 17, 2007, the plaintiff returned to Dr. Chang's office for a follow-up appointment. (R. 440). Dr. Chang had given her a Medrol Dosepak, and the plaintiff reported that it was not effective for helping the pain in her right leg. (R. 442).[15] Dr. Chang recommended the plaintiff get an MRI to determine whether there was any nerve impingement caused by disc herniation or spur formation. (R. 442). The plaintiff had an MRI on July 23, 2007, which showed degeneration of the L4-L5 and L5-S1 discs. (R. 429-30). At the L4-L5 level, the MRI showed disc degeneration and a mild bulge. (R. 429). At the L5-S1 level, the MRI showed a 6mm disc bulge with some left lateral recess stenosis and mild to moderate neural foraminal narrowing due to the disc bulge. (R. 429). The MRI showed that the disc protrusion at the L5-S1 level had decreased slightly since the plaintiff's last MRI, but that there was still left lateral recess and medial neural foraminal stenosis at the L5-S1 level. Plaintiff had a follow-up appointment with Dr. Chang on July 24, 2007. (R. 436). Dr. Chang told the plaintiff that the nerve tumor did not appear to have changed

---

[14] This is the second time in the record where the plaintiff complains of pain in her right leg, and it is the first time she had complained of pain in her right leg in almost a year. Dr. Chang, however, stated that this was the first time where the plaintiff complained of pain in her right leg even though she came to see him when she had pain in her right leg in August 2006. *Compare* (R. 442) and (R. 455).

[15] Medrol Dosepak is a brand name for the generic drug methylprednisolone, which is an oral steroid used to treat inflamed tissue. http://www.emedicinehealth.com/drug-methylprednisolone/article_em.htm (accessed Nov. 29, 2009).

since her last MRI. (R. 436). Dr. Chang recommended that the plaintiff receive injection treatments because she was still in pain. (R. 436).

On July 20, 2007, the plaintiff visited Dr. Angelopoulos. (R. 428). The plaintiff told Dr. Angelopoulos that she felt constant pain, but that the pain was somewhat lessened when she was sitting or lying down. (R. 428). Dr. Angelopoulos opined that the plaintiff suffered from chronic left-sided radiculopathy with recurrent L5-S1 disc protrusion, which was noted on the July 23, 2007 MRI. (R. 428). Dr. Angelopoulos recommended that the plaintiff receive a left-sided L5 transforaminal steroid injection. (R. 428). On August 6, 2007 and October 15, 2007, Dr. Angelopoulos injected a steroid known as Depo-Medrol into the plaintiff's back. (R. 431-432).[16]

**B.**

**The Plaintiff's Testimony At The Hearing**

Ms. Betts testified that at the time of the hearing she felt a sharp pain in her lower back (R. 59) – the same pain she experiences almost every day. (R. 60). The pain in her back usually spreads down her left leg, but at the time of the administrative hearing, she testified that it was only mildly spreading down her leg. (R. 60). When asked by the ALJ what her pain level was at on a scale of one to ten, the plaintiff testified that she was at a ten. (R. 60). When asked by her attorney, however, the plaintiff testified that she was at an eight, and that the pain was in her back and left leg. (R. 65-66). The plaintiff testified that when the pain spreads down her left leg, it travels all the way to her toes. (R. 60). The plaintiff also testified that, as of a few weeks before the hearing, she began experiencing radiating pain down her right leg. (R. 61). She said that the pain had been radiating to her fingers starting about a month before the administrative hearing. (R. 62). The last time she had seen a doctor for back pain was October 15, 2007. (R.

---

[16] Depo-Medrol is an injectable methylprednisolone. *See* http://www.rxlist.com/depo_medrol-drug.htm (accessed Dec. 2, 2010).

64).[17]  She said that the doctors had recommended a third surgery to remove the nerve tumor in her back, but that she would be paralyzed on her left side if they removed the tumor.  (R. 70).

At the time of the hearing, the plaintiff worked four and one-half hours per day, five days per week, as a bus driver. (R. 49).  Her previous employment was driving a school bus for a different company, where she had worked from September 2005 to February 2006.  (R. 50). Plaintiff testified that she had to leave that job because she could not handle the pain she felt due to the bus bouncing as she drove.  (R. 71). She said she had never driven a stick shift bus and that her car was an automatic as well, so her left leg was never needed for driving a bus or her car. (R. 52).  She had been offered the opportunity to work more hours, but declined because, according to her, four and one-half hours working irritated her back.  (R. 56). She did not drive a school bus during summer break.  (R. 55). Plaintiff testified that the reason why she continued to work was because she needed money.  (R. 72).  Driving a school bus irritated her back, but she could not personally testify whether the irritation was caused by muscle pain or the issues with her spine. (R. 76).

The plaintiff testified that she would leave the bus yard at 6:30 a.m. (R. 69). Before her first pick-up at about 7:11 a.m., she would walk around the bus and stretch.  (R. 69-70).  She had to get up and stretch after dropping the children off at school.  (R.70).  When she finished her morning bus route at approximately 9:30 a.m., she had to go home and lie down until it was time to get ready for her 2:00 p.m. shift, for over four hours.  (R. 67).  She testified that she had to lay down the whole time she was home to ease her pain, and that she wore the lidoderm patch during this time period. (R. 67-68).  She testified that she could sit for thirty minutes before she needed to stand, and that she never drove a school bus for more than thirty minutes in the same position. (R. 56-57).  She could not stand or walk for more than ten minutes without needing to sit down.

---

[17] The administrative hearing took place on January 24, 2008.

(R. 57). She had difficulty climbing the three flights of stairs in her house, but did not specifically testify whether she had trouble climbing the approximately four steps in the school bus. (R. 59).

The plaintiff testified that she was currently applying lidoderm, a lidocaine patch, for back pain as well as taking Aleve. (R. 62, 64). The plaintiff was taking other medications, they were unrelated to her back pain. (R. 62-64). Throughout the course of her back pain treatment, she had taken Lyrica, Gabapentin (Neurotonin), Darvocet, and Voltaren. (R. 68-69). Although the record is unclear with regard to which medications the plaintiff had been taking before the administrative hearing, she testified that her doctors told her to stop taking those medications because they were inflaming her liver. (R. 68). The plaintiff testified that she had a steroid injection on October 15, 2007, and that she believed she had three steroid injections in 2007. (R. 72-73). She felt that the injections were effective for about two months per injection. (R. 73).

The plaintiff testified that her grandmother helps her bathe (R. 52). She sometimes washed the dishes, cooked, swept the floor, vacuumed the house, did the laundry (with the help of her daughter), and folded clothes. (R. 54). She testified that she generally needed help when doing housework: her daughter would help her prepare large meals and assist with sweeping and vacuuming because those chores for a long period of time irritated her back. (R. 77-78). She would go to the grocery store, but her daughter and grandmother would pick items off the shelves and put them into the shopping cart. (R. 55, 79). When asked by the ALJ, she testified that she could lift 20 pounds at one time. (R. 56).

# C.

## The Vocational Expert's Testimony

The vocational expert ("VE") testified that the plaintiff's past relevant work as a bus driver was semi-skilled and medium in exertional level with no transferable skills. (R. 82). Her work as a housekeeper was unskilled and in light exertional level. (R. 82). Her work as a file clerk was semi-skilled and light in exertional level with no transferable skills. (R. 82). The ALJ asked the VE to consider a hypothetical individual with a vocational background similar to the plaintiff's who could perform a full range of light work but could not climb ladders, ropes, or scaffolds; could only occasionally climb stairs or ramps; could balance frequently; could only occasionally stoop or crouch; and who could not kneel or crawl. (R. 82). When asked whether such an individual could perform any of the plaintiff's past relevant work, the VE replied in the affirmative for the housekeeping and file clerk experience. (R. 83). The VE went on to testify that, even though the job skills were not transferable, such an individual could work in the fast food industry (50,000 jobs), as a non-post office mail clerk (6,000 jobs), or as a cashier (24,000 jobs). (R. 83).

The ALJ then asked a second hypothetical, where the VE was to assume the same factors and limitations of the first hypothetical, but with an added option for the individual to sit or stand. (R. 83). The VE replied that, with the additional limitation, an individual could still perform the file clerk jobs as long as it did not take the person off task for more than ten percent of the day. (R. 83). The VE stated that an individual similarly situated to the plaintiff could also work in the following capacities: electrical accessory assembly (14,000 jobs), room service clerk for a hotel (13,000 jobs), or as a host/greeter (2,500 jobs). The VE again added the caveat that an individual could not successfully work in any of those capacities if he or she were off task

more than ten percent of the day. (R. 84). The VE stated that a sit or stand option would take an individual off task if they needed to walk around for too long or alternate positions too frequently. (R. 92).

The ALJ then asked the VE to assess a hypothetical individual with a similar background to the plaintiff's who, with the same sit or stand option, could perform sedentary work: lifting up to ten pounds occasionally, constantly manipulating (both gross and fine) objects no smaller than a paperclip, with a sit or stand option. (R. 86). The VE stated that the following jobs would be available: information clerk (3,500 jobs), charge account clerk (5,500 jobs), and eyeglass assembler (2,200 jobs). (R. 86). The VE again stated that the individual could not be off task for more than ten percent of the day. (R. 86).

The ALJ then asked the VE whether employment was available for an individual with the previously discussed sedentary and sit or stand limitations and an additional limitation of being limited to performing simple, routine, and repetitive tasks. (R. 87). The VE replied in the negative: there were no jobs available to such an individual. (R. 87). The VE also testified that a person who misses more than ten to twelve days of work per year was considered unemployable, and that an individual who exceeded the customary limits for break times would eliminate the jobs the VE had described as well as any other occupations. (R. 87-88).

## IV.

## THE ADMINISTRATIVE LAW JUDGE'S DECISION

The ALJ found that plaintiff had not engaged in substantial gainful activity since February 6, 2003, her alleged onset date of disability. (R. 32, 50, 99). Next, the ALJ found that the plaintiff had several severe impairments: degenerative disc disease of the lumbar spine, status post laminectomy and excision of tumor, lower left side radiculopathy, and mild cervical

spondylosis. (R. 32). These impairments, according to the ALJ, did not meet or medically equal one of the listed impairments in 20 C.F.R. §§ 404,1520(d), 404.1525, 416.920(d), 416.925, or 416.926. (R. 34).

The ALJ then assessed the plaintiff's Residual Functional Capacity ("RFC"). He gave a cursory review of the medical evidence, beginning with the plaintiff's January 4, 2004 epidural injection. (R. 33). He provided a very brief summary of the plaintiff's medical treatment, which included visits to the emergency room, two surgeries, post-surgical appointments, and doctors' diagnoses, medications prescribed to the plaintiff, and results from MRIs. (R. 33-34). The ALJ briefly noted Dr. Chang's diagnosis, but did not further discuss Dr. Chang's medical opinion. (R. 34). The ALJ did not note any other medical opinions or evidence in his findings except to state that Dr. Chang's medical opinion was to be given "little weight" because his opinion was inconsistent with allowing the plaintiff to operate a bus. (R. 36). Notably, the ALJ also gave little weight to the state agency's medical opinion that the plaintiff could perform light work because they did not receive certain medical records until after they made a decision about the plaintiff's alleged disability. (R. 36).

The ALJ assessed plaintiff's symptoms and complaints and considered the factors in 20 C.F.R. §§ 404.1529, 416.929, and Social Security Rulings ("SSR") 96-4p and 96-7p. (R. 35). According to the ALJ, plaintiff's medically determinable impairments could reasonably be expected to produce the symptoms she alleged, but "her statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent that are inconsistent with the residual functional capacity" because the plaintiff attempted to work even though she claimed her disability was debilitating, she could climb the school bus stairs, and sometimes perform household chores. (R. 35). The ALJ stated that the plaintiff was not entirely

credible because she was not taking pain medications, which might be able to alleviate her "intermittent" symptoms. (R. 35).

The ALJ stated that the objective medical evidence was fully consistent with the RFC. (R. 35). The ALJ based his findings on what he characterized as the plaintiff's "conservative" treatments for complaints of back pain and radiculopathy, which included epidural steroid injections and surgery with good postsurgical course. (R. 35). The ALJ concluded that the claimant retains the ability to perform sedentary work, which the regulations define as:

> lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. §§404.1567(a), 416.967(a). The ALJ found that plaintiff was further restricted insofar as she would only be able to perform work with limited postural activities that includes a sit/stand option consistent with the severity of her back impairment. (R. 35-36).

The ALJ then reviewed the plaintiff's past work history. (R. 36). He noted that plaintiff's job as a school bus driver was medium, semi-skilled work, her job as a housekeeper was light, unskilled work, and her job as a file clerk was light, semi-skilled work. (R. 36). The ALJ adopted the VE's opinion that the plaintiff could not perform any of her past relevant work because her past work activities were inconsistent with the RFC finding that plaintiff was able to perform sedentary work. (R. 36). Next, the ALJ considered whether plaintiff could perform other jobs that existed in the national economy. Considering the fact that plaintiff could perform sedentary work, with the additional sit/stand limitation, the ALJ employed the VE's answers to his hypotheticals regarding whether the plaintiff could perform jobs in the national economy with the additional sit/stand limitation. (R. 37). The ALJ relied upon the VE's testimony that a hypothetical person with the plaintiff's limitations could perform jobs such as information clerk

(3,500 jobs in the Chicago region), account clerk (5,500 jobs in the Chicago region), and eye glass assembler (2,200 jobs in the Chicago region). (R. 37). As a result, the ALJ found that plaintiff was not disabled and was not entitled to SSI or DIB under the Act. (R. 37).

## V.

## ANALYSIS

### A.

### Standard of Review

A court must affirm the ALJ's decision if it is supported by substantial evidence. 42 U.S.C. §§ 405(g). Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). Substantial evidence must be more than a scintilla but may be less than a preponderance. *Schmidt v. Astrue*, 496 F.3d 833, 841-42 (7th Cir. 2007). A court may not reconsider facts, evidence, or credibility determinations the ALJ considered. *Id.* at 842. Where conflicting evidence would allow reasonable minds to differ as to whether the plaintiff is disabled, the Social Security Commissioner has the responsibility for resolving those conflicts. *Binion*, 108 F.3d at 782. The court's responsibility is to decide whether the ALJ built "a logical bridge" from the evidence to his conclusion that the plaintiff is not disabled. *Simila*, 573 F.3d at 513.

Judicial review of the Commissioner's decision is given deference, but the court cannot act as a "rubber stamp" for the Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). In order for the court to affirm a denial of benefits, the ALJ must "minimally articulate" the reasons for his decision. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). The ALJ's decision  must assess the evidence in such a way that will allow the court to assess

the validity of his findings and afford the plaintiff a meaningful judicial review. *Scott*, 297 F.3d at 595.

## B.

### The Required Five-Step Sequential Analysis

Social Security Regulations require a five-step sequential analysis by the ALJ to determine whether the plaintiff is disabled: 1) whether the plaintiff is engaged in substantial gainful activity; 2) whether the plaintiff has a severe impairment; 3) whether the plaintiff has an impairment or combination of impairments that meets or medically equals one of the impairments defined as disabling in the Commissioner's regulations; 4) whether the plaintiff is able to perform past relevant work; and 5) whether the plaintiff is able to perform any other work in the national economy. 20 C.F.R. §§ 404.1520, 416.920; *Briscoe ex rel. Taylor. Barnhart*, 425 F.3d 345, 51-52 (7th Cir. 2005). An affirmative answer leads wither to the next step or, on steps three or five, to a finding that the plaintiff is disabled. 20 C.F.R.§§ 404.1520, 416.920; *Briscoe*, 425 F.3d at 352. A negative answer at any step other than step three stops the inquiry and leads to a determination that the plaintiff is not disabled. 20 C.F.R. §§ 404.1520, 416-920; *Stein v. Sullivan*, 892 F.2d 43, 44 at n.1 (7th Cir. 1989). The plaintiff bears the burden of proof through step four: if the plaintiff meets her burden, it shifts to the Commissioner at step five. *Briscoe*, 425 F.3d at 352.

## C.

### The ALJ's Adverse Credibility Finding Is Not Supported By Substantial Evidence

The first of several issues that the plaintiff contends requires a remand is that the ALJ misstated and misrepresented her testimony in reaching an adverse credibility finding. The plaintiff first argues that the ALJ mischaracterized her part-time, nonconsecutive work schedule.

She testified she cannot sit in the same position for more than thirty minutes at a time and that she must lie down for five hours in between her morning and afternoon shifts. She argues that the ALJ misstated her testimony by stating that she works for four hours per day without adding the caveat that she works two non-consecutive shifts, that she must stand up and walk around every thirty minutes, and that she must lie down for five hours between her two shifts driving a bus. (*Plaintiff's Memorandum* at 10-12).

Plaintiff's second argument is that the ALJ mischaracterized her testimony with regard to whether she was taking pain medication at the time of the administrative hearing. Plaintiff argues that the record shows that the plaintiff wore a lidoderm (5% lidocaine) patch when she was in between shifts at work and that also she took over-the-counter Aleve to help alleviate her back pain. At the administrative hearing, the plaintiff testified that her doctors took her off of oral pain medication and prescribed the lidoderm patch because she was experiencing "side effects" from the medicine, i.e. the medicine caused liver inflammation. (*Plaintiff's Memorandum* at 12; R. 64, 68-69).

Plaintiff's final credibility argument is that the ALJ's determination that the plaintiff's ability to sometimes participate in household chores undercut her credibility was incorrect because minimal daily activities are not inconsistent with having a disability. Plaintiff argues that the ALJ failed to consider SSR 96-7p, which states, "[t]he individuals' daily work activities may be structured so as to minimize symptoms to a tolerable level or eliminate them entirely, avoiding physical or mental stressors that would exacerbate the symptoms. . . ." (*Plaintiff's Memorandum* at 13).

Although an ALJ's credibility finding is given "considerable deference," *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006), the ALJ's credibility finding must be supported by

the evidence in the record. SSR 96-7p; *Scheck v. Barnhart*, 357 F.3d 697, 701 (7th Cir. 2004). The standard a court uses to review the Commissioner's decision is deferential, but it is not abject. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). Mischaracterizing the record can constitute error that requires remand for further determination. *Terry v. Astrue*, 580 F.3d 471, 477-78 (7th Cir. 2009). In *Ribaudo v. Barnhart*, 458 F.3d 580 (7th Cir. 2006) the court remanded the case when the ALJ found that the claimant's complaints of pain were inconsistent with the medical record, but he failed to specify which medical evidence he was relying on in making the credibility determination and also failed to address the claimant's medical evidence that he was in a significant amount of pain. *Id.* at 584-85.

Here, the ALJ did not address the fact that the four and one-half hours per day the plaintiff worked took place over two shifts or that between those two shifts, the plaintiff had to lie down for nearly four hours because of her back pain. The ALJ was aware of this fact because he asked the plaintiff about her non-consecutive work hours, but he made no mention of it when assessing the plaintiff's credibility in his finding. (R. 67). The ALJ misstated part of the plaintiff's testimony by omitting the significant fact that the plaintiff had to lie down for almost as long as she worked between her two shifts. This mischaracterization of the plaintiff's testimony requires a remand to determine if the plaintiff is even capable of working an eight hour work day. This is not to say that the ALJ was bound to accept the plaintiff's story. He was not. But so far as the record reveals, he did not reject it, or if he did, he did not say so.

The ALJ also failed to analyze whether plaintiff's back problems would keep her "off task" for more than ten percent of the work day. The VE testified that if an individual is off-task more than ten percent of the work day or missed more than ten or twelve work days per year, they would be unemployable. (R. 86-87, 90-93). The ALJ never seems to have considered the

VE's testimony with the medical evidence and plaintiff's testimony. This must be considered on remand.

The ALJ used the fact that the plaintiff was not taking any pain medications at the time of the hearing (R. 35) against her. This finding was contrary to the evidence that not only showed that plaintiff was using a lidoderm patch between her shifts and was taking Aleve to help with her back pain, but that showed that plaintiff was told to discontinue taking oral pain medication because it was inflaming her liver. (R. 62, 64, 68, 414, 45). The ALJ should not have held the cessation of oral pain medication against her because she was merely following doctor's orders.

Finally, the ALJ improperly discounted the plaintiff's credibility because she sometimes participated in household chores and did other daily activities, such as going to the grocery store. Plaintiff correctly points out that minimal daily activities are not necessarily inconsistent with being disabled. In *Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir. 2004), the court held that there is a difference between being able to engage in sporadic physical activities and being able to work eight hours a day, five days a week. The multiple legal and factual flaws in the ALJ's assessment of plaintiff's credibility require a remand.

## D.

### The Plaintiff's Attempts To Work Were Not Inconsistent With Her Disability

Plaintiff argues that the ALJ's decision must be remanded because the ALJ's finding that the plaintiff's part time work attempts were inconsistent with the severity of her restrictions was contrary to medical evidence and unsupported by substantial evidence. Plaintiff further argues that she never worked full time as a bus driver and always had a five hour break between her two shifts. (*Plaintiff's Memorandum* at 15). There is force to the argument that working is not conclusive of non-disability. Plaintiff relies on *Henderson v. Barnhart*, 349 F.3d 434, 435 (7th

Cir. 2003), *Hawkins v. First Union Corp.*, 326 F.3d 914, 918 (7th Cir. 2003), *Perlman v. Swiss Bank Corp. Comprehensive Disability Protection Plan*, 195 F.3d 75, 982-83 (7th Cir. 1999), *Wilder v. Apfel*, 153 F.3d 799, 801 (7th Cir. 1998), and *Jones v. Shalala*, 21 F.3d 191, 192-93 (7th Cir. 1994) for the proposition that "there is no logical incompatibility between working full time and being disabled from working full time." (*Plaintiff's Memorandum* at 15). Plaintiff further asserts that the ALJ failed to consider whether she was forced into seeking employment because of desperate financial circumstances. (*Plaintiff's Memorandum* at 15) (citing *Schmidt v. Barnhart*, 395 F.3d 737, 746 (7th Cir. 2005).

SSR 96-8p requires that an RFC is meant to assess an individual's ability to work on a "regular and continuing basis." It defines "regular and continuing basis" as eight hours per day, five days per week. Applicable Seventh Circuit decisions hold that there is no logical incompatibility with an individual working and disability under the Act. In *Henderson*, 349 F.3d at 435, the Court held that holding a job does not disclose the possibility that a person is disabled because the individual filing for social security benefits "may have a careless or indulgent employer or be working beyond his capacity out of desperation." In this case, the plaintiff worked for four and a half non-continuous hours throughout the course of the morning and afternoon. The plaintiff testified that she had to actually lie down for the duration of her four or five hour break between shifts of driving a school bus. (R. 67). None of this testimony was contrary to any of the medical evidence presented. The ALJ failed to address this major factor when finding that the plaintiff's attempts to work cut against her credibility. Furthermore, the plaintiff testified that she received public assistance in the form of food stamps and had no other income. (R. 51-52).

On remand, the ALJ must consider the difference between the plaintiff working approximately twenty hours per week, her conduct between the shifts she worked as a bus driver, and working 8 hours a day, five days a week when determining whether plaintiff has the residual functional capacity to work on a regular and continuing basis.

**E.**

**The ALJ Mischaracterized The Medical Evidence And Failed To Give The Treating Physician's Medical Opinion Its Proper Weight**

Plaintiff argues that the ALJ failed to give controlling weight to the objective medical testimony and "disregarded the entire line of medical evidence and substituted his own opinion" in violation of applicable Seventh Circuit case law. (*Plaintiff's Memorandum* at 17). Plaintiff relies on *Pancake v. Amax Coal Co.*, 858 F.2d 1250, 1255 (7th Cir. 1988), where the Seventh Circuit held that an ALJ "cannot substitute his expertise for that of a qualified physician, and , absent countervailing clinical evidence or a valid legal basis for doing so, cannot simply disregard the medical conclusions of a qualified physician." Plaintiff also relies on *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985), which held that an ALJ must address uncontradicted evidence supporting a finding of disability and not choose only the evidence which favors his or her ultimate conclusion. (*Plaintiff's Memorandum* at 17).

Plaintiff asserts that the ALJ should have given controlling weight to the RFC Dr. Chang submitted on May 30, 2007. Dr. Chang's RFC stated that the plaintiff suffers from chronic pain, radiculopathy, numbness, reflex loss, severe fatigue, and that she suffered from constant low back and leg pain. Plaintiff asserts that Dr. Chang further found that she did not retain the ability to do even sedentary work on a full time basis because she was unable to sit, stand, or walk for "any period," could not lift at all, and would miss work more than three times per month due to her impairments and treatments associated therewith. (*Plaintiff's Memorandum* at 16). Plaintiff

further argues that, if the ALJ disagreed with Dr. Chang's opinion, he must have relied on another medical report or multiple reports to substantiate his position. (*Plaintiff's Memorandum* at 16) (citing *Scivally v. Sullivan*, 966 F.2d 1070, 1077 (7th Cir. 1992). Plaintiff states that it would have been impossible for the ALJ to find medical evidence that contradicted Dr. Chang's RFC because the other treating physicians' opinions (Dr. Engelhard, Dr. Slavin, and Dr. Angelopoulos) were "completely consistent" with Dr. Chang's findings. *(Plaintiff's Memorandum* at 17).

If a treating physician's opinion about the nature and severity of a claimant's impairment is consistent with the substantial evidence in the record, it should be given controlling weight. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). If the ALJ does not give the treating physician's opinion controlling weight, the ALJ must give specific reasons why. 20 C.F.R. §§ 404.1527(d)(2)-(d)(6), 416.927(d)(2)-(d)(6); *Moss v. Astrue*, 555 F.3d 556, 560-61 (7th Cir. 2009).

The ALJ's rejection of Dr. Chang's medical evidence was unsupported by other medical evidence. In a three-sentence paragraph, the ALJ discounted the entirety of Dr. Chang's medical testimony because he believed that allowing the claimant to operate a bus combined with the inconsistencies with the claimant's testimony and attempts to work part-time rendered Dr. Chang's medical opinion not credible. (R. 36). Besides the fact that the record clearly shows that Dr. Chang recommended that the plaintiff stop driving the school bus (R. 342), the ALJ failed to give sufficient detail with regard to why he was discounting Dr. Chang's medical opinion.

**F.**

**The ALJ's Hypothetical Work Situations Were Sufficiently Specific
Under SSR 96-8p And 96-9p**

Plaintiff next asserts that an RFC of "sedentary" with two additional limiting factors combined is a violation of SSR 96-8p and SSR 96-9p, which require that two limitations must be considered and analyzed separately. (*Plaintiff's Memorandum* at 18). Plaintiff argues the ALJ failed to specifically address the frequency of the individual's need to alternate between sitting and standing, as well as the length of time the plaintiff can continuously perform either function. Plaintiff relies on *Castrejon v. Apfel*, 131 F. Supp. 2d 1053 (E.D. Wis. 2001) for her argument that a remand is necessary when an ALJ fails to specify the frequency in which a claimant would sit or stand when the ALJ finds that the individual retains the capacity to work at a sedentary job. Plaintiff argues that flaw of the ALJ's failure to assess the frequency in which she would sit or stand is that her ability to perform a particular job could not be determined.

In *Ketelboeter v. Astrue*, 550 F.3d 620, 626 (7th Cir. 2008), the Seventh Circuit held that an ALJ's hypothetical, which assumed the claimant would have the option to sit or stand as needed, was not vague with regard to the frequency with which the claimant would sit or stand throughout the day. Here, the ALJ's asked the VE a hypothetical in which a person with the limitations of the plaintiff "would be allowed the option to sit or stand." (R. 83). This hypothetical implies that the hypothetical person would be given the option to sit or stand as needed. Therefore, the ALJ's hypothetical was sufficient under SSRs 96-8p and 96-9p.

## G.

### The ALJ Did Not Address Conflicts Between The Dictionary Of Titles And The Vocational Expert's Testimony In Violation of SSR 00-4p.

Plaintiff's final argument is the ALJ failed to address the inconsistency between the absence of a sit/stand option within the Dictionary of Titles' definition of sedentary work and the VE's opinion that the plaintiff could perform three sedentary jobs. Plaintiff specifically argues that SSR 00-4 placed an affirmative duty on the ALJ to ask the VE hypotheticals that included information regarding time limits for the amount of time plaintiff could sit for without moving around, stretching, and changing positions. Plaintiff argues that the VE opined that an individual who goes off-task for more than ten percent of the day would be precluded from working, and the ALJ's failure to resolve the conflict between the plaintiff's need to stretch and walk around after thirty minutes of work and her need to stay on task ninety percent of the day constitutes legal error. (*Plaintiff's Memorandum* at 23-24).

An ALJ has an affirmative duty to ask a VE if the evidence that the expert provided about job limitations conflicts with the job requirements listed in the DOT, and if the evidence appears to conflict, the ALJ must ask the vocational expert to explain the conflict. *Prochaska*, 454 F.3d at 735. Here the ALJ asked the VE whether the jobs that he cited were consistent with the descriptions in the DOT (R. 88), but he did not ask the VE whether the sit/stand option conflicted with the jobs he listed. Because there is a potential conflict between the jobs and the plaintiff's ability to have the option to sit or stand and still be able to perform the jobs, this potential must be addressed and resolved on remand.

**CONCLUSION**

Plaintiff's motion for summary judgment [#18] is GRANTED.

ENTERED: _____
UNITED STATES MAGISTRATE JUDGE

DATE: 5/6/11